THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JESUS SANCHEZ, | ) |
|                *Plaintiff*, | ) No. 24 C 6139 |
| v. | ) |
| | ) Chief Judge Virginia M. Kendall |
| WEXFORD HEALTH SOURCES, INC., ZANETA FOUT, SHERWIN MILES, and STEVEN CAMPBELL, | ) |
|                *Defendants*. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jesus Sanchez, an Illinois inmate incarcerated at Graham Correctional Center, brings a civil rights action under 42 U.S.C. § 1983 against Wexford Health Sources, Inc. ("Wexford"), Zaneta Fout, Sherwin Miles, and Steven Campbell (collectively, the "Defendants"), alleging that they were deliberately indifferent to his medical needs after he incurred a facial injury. He also brings an Illinois state law claim for medical malpractice, as well as claims for declaratory and injunctive relief. Wexford moves to dismiss Sanchez's Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, Wexford's Motion to Dismiss [60] is denied in part and granted in part.

**BACKGROUND**

The following facts are set forth in the Complaint, except where noted, which the Court accepts as true for purposes of a motion to dismiss. *See Lax v. Mayorkas*, 20 F. 4th 1178, 1181 (7th Cir. 2021). Sanchez is currently incarcerated at the Graham Correctional Facility ("Graham"). (Dkt. 35 ¶ 7). He was incarcerated at the Sheridan Correctional Facility ("Sheridan") from approximately August 2013 until July 2023. (*Id.*). The Illinois Department of Corrections

1

("IDOC") contracted with Wexford to provide healthcare services to inmates at the Sheridan and Graham correctional facilities. (Dkt. 35 ¶ 12). Wexford provides "comprehensive medical and mental health services" that include, but are not limited to, "the full spectrum of medical subspecialities, x-ray services . . . and consultative services in all fields of medicine." (*Id.*).

On the morning of January 14, 2023, Sanchez sustained severe facial trauma after an altercation with another inmate at Sheridan. (*Id.*¶ 14). Sanchez was escorted to the Health Care Unit ("HCU"), where he was examined by Zaneta Fout, a nurse at the facility. (*Id.* ¶¶ 9, 16). Fout provided Sanchez with an ice pack, applied antibiotic ointment to his facial wounds, and gave him a medicated oral rinse for the lacerations in his mouth. *Id.* ¶ 17. Fout did not take any other actions or schedule a follow-up appointment. (*Id.* ¶ 19). Either that night or the following night, Sanchez told Fout that he had worsening pain and impaired breathing, and that he believed his nose was broken. (*Id.* ¶ 22). Fout said that she would arrange for an x-ray and asked Sanchez to submit a formal medical request slip, which Sanchez did on January 16 and 17, 2023. (*Id.* ¶¶ 23, 25). On January 18, 2023, after receiving no response to his medical requests, he followed up with a different nurse who told him that the HCU was "severely backlogged and understaffed." (*Id.* ¶ 26).

On January 22, 2023, Sanchez filed an emergency grievance alleging denial of medical treatment. (*Id.* ¶ 28). The warden of Sheridan, Sherwin Miles ("Miles"), forwarded the request to the HCU. (*Id.* ¶ 29). Sanchez claims that, despite Wexford's obligation to arrange offsite treatment in emergency situations, no emergency treatment or urgent treatment was provided to him. (*Id.* ¶ 29). On January 26, 2023, a correctional officer called the HCU after noticing Sanchez's visibly deformed nose and reported that Sanchez could not breathe and appeared to have a broken nose. (*Id.* ¶ 30). Sanchez was examined by a nurse that day and was evaluated by a physician's assistant the following day, who ordered facial x-rays and referred Sanchez to an optometrist. (*Id.* ¶ 32). A

few days later, Sheridan's optometrist examined Sanchez and referred him to an outside eye specialist for further assessment. (*Id.* ¶ 33). This put Sanchez on a medical hold, preventing his transfer to another facility. (*Id.*).

Sanchez received x-rays on February 1, 2023, which did not reveal any obvious fractures, but the reviewing radiologist further recommended a CT scan if "clinical suspicion" persisted. (*Id.* ¶ 34.) Sanchez's pain and breathing issues persisted for several weeks thereafter. (*Id.* ¶ 35). On February 22, 2023, Dr. Merrill Zahtz inspected Sanchez and stated that he wanted to refer Sanchez to an outside ear, nose, and throat ("ENT") specialist. (*Id.* ¶ 36). Dr. Zahtz explained that scheduling a "medical writ" could take at least four-to-six months. (*Id.*). At this time, Sanchez had been approved to transfer to the Graham correctional facility ("Graham"). (*Id.*). Sanchez denied further medical treatment to avoid a medical hold and ensure his prompt transfer to Graham. (*Id.* ¶ 37). He intended to seek further care at Graham after his transfer. (*Id.* ¶39).

In May 2023, after a medical staff member noted Sanchez's nasal deformity and recommended a CT scan, Sanchez expressed frustration at Sheridan's delays and reiterated his preference to seek care at Graham. (*Id.* ¶38). On July 12, 2023, IDOC transferred Sanchez to Graham. (*Id.* ¶ 40). Five days later, Sanchez submitted a "sick call" request for evaluation of his nose injury and breathing impairment and was told that he could not see a qualified provider until late September because only one physician served the 1,600-person facility. (*Id.* ¶¶ 41–42). Sanchez alleges that Graham's HCU was "routinely and systematically understaffed" which resulted in "untreated inmates." (*Id.* ¶ 42). Sanchez further contends that Steven Campbell, the

warden of Graham, was aware of the "chronic understaffing" of the Graham HCU and that inmates were not receiving "appropriate and timely treatment." (*Id.*).

On July 21, 2023, Sanchez filed a grievance claiming "excessive wait times." (*Id.* ¶ 43). In response, an individual at the Graham HCU "promised that additional providers would be hired" to deal with the provider scarcity and long wait times. (*Id.* ¶ 43–44). In November 2023, after several delays and appointment cancellations, Sanchez filed another grievance complaining of an appointment that was mistakenly given to the wrong inmate. (*Id.* ¶¶ 45-49). Sanchez saw a nurse practitioner on December 13, 2023, and described his continued breathing issues. (*Id.* ¶ 53). After new facial x-rays were performed on December 18, 2023, Sanchez was informed that the imaging showed "healed fractures of the orbital floor and nasal bone." (*Id.* ¶¶ 47, 51–52, 56). Again, the reviewing radiologist recommended at CT scan "if clinical concern remained." (*Id.* ¶ 55.) In early January, the nurse practitioner told Sanchez she would recommend ENT evaluation, but Wexford would not authorize cosmetic surgery. (*Id.* ¶¶ 56, 58). Sanchez was offered a lubricating nasal spray while he awaited ENT evaluation, but he did not receive it. (*Id.* ¶ 58).

On February 6, 2024, Sanchez was transported to an off-site ENT clinic on medical writ, which ultimately led to Sanchez receiving a CT scan on March 7, 2024. (*Id.* ¶¶ 59, 63). A physician's assistant at the ENT clinic told Sanchez that Wexford would not authorize corrective surgery. (*Id.* ¶¶ 61-62). After reviewing the CT scan results, the ENT provider advised using nasal spray for breathing difficulties but declined to recommend surgery. (*Id.* ¶ 64). Sanchez was prescribed a nasal spray by several doctors but did not receive it until June 2024. (*Id.* ¶¶ 65-66). Sanchez asserts that the nasal spray did not alleviate his breathing issues. (*Id.* ¶ 66).

Sanchez claims that he continues to suffer from a visibly deformed nose with bone protrusion, obstructed nasal airflow that severely impairs his breathing and sleep, and intermittent

headaches and blurred vision in his left eye. (*Id.* ¶ 70). He further asserts that Wexford has a "longstanding pattern and practice of denying care to inmates" like himself, resulting in court-issued consent decrees and independent monitors. (*Id.* ¶ 13). This "depravity," Sanchez contends, is "so rampant" that IDOC included metrics in its contract to fine Wexford for any court findings of deliberate indifference or acts of discrimination in treating inmates. (*Id.*).

Sanchez filed his original *pro se* Complaint on July 19, 2024, along with an application to proceed *in forma pauperis* ("IFP"). (Dkts. 1, 3). The Court granted Sanchez's IFP application and held that his Original Complaint sufficiently stated a claim. (Dkt. 7). Sanchez subsequently obtained counsel and filed an Amended Complaint. (Dkt. 35). In his Amended Complaint, Sanchez asserts Eight and Fourteenth Amendment claims against Wexford and Fout under § 1983 for deliberate indifference in providing medical services to him (Count I); Eighth and Fourteenth Amendment claims against Campbell and Miles under § 1983 for deliberate indifference in providing medical services to him (Count II); medical malpractice claims against Wexford and Fout (Count III); and declaratory and injunctive relief against Wexford and Campbell (Count IV). (Dkt. 35 at ¶¶ 71-96). Wexford moves to dismiss Counts I, III, and IV. (Dkt. 60).

## **LEGAL STANDARD**

To survive a motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Kaminski v. Elite Staffing*, 23 F.4th 774, 776 (7th Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)). Specifically, "a plaintiff must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). At the same time, "allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). As such, "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Further, the moving party bears the burden of establishing the insufficiency of the plaintiff's allegations.

## DISCUSSION

### I. Monell Claim (Count I)

In Count I, Sanchez brings a § 1983 claim against Wexford and Fout, alleging they were deliberately indifferent to his health and medical needs by failing to provide him with necessary and adequate medications by way of "custom and policy" in violation of his Eighth and Fourteenth Amendment rights. (Dkt. 35 ¶¶ 72–79). Both the Eighth and Fourteenth Amendments prohibit deliberate indifference to the serious medical needs of prisoners. *Brown v. LaVoie*, 90 F.4th 1206, 1212 (7th Cir. 2024) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015).

Sanchez argues that Wexford should be held liable directly and indirectly for the acts or omissions of Fout. (Dkt. 35 ¶¶ 72–79). Both Fout and Wexford deny that Fout is or was an employee of Wexford. (Dkt. 61 at 6); (Dkt. 72 at 4). Even if she was a Wexford employee, a private corporation like Wexford cannot be held "vicariously liable" under Section 1983 "for its employees' deprivations of others' civil rights." *Gayton v. McCoy*, 593 F.3d 610, 622 (7th Cir. 2010) (quoting *Iskander v. Vill. Of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)); *see also Feazell v. Wexford Health Sources, Inc.,* 140 F.4th 438, 442 (7th Cir. 2025) ("municipalities are not vicariously liable for constitutional torts committed by their employees"). Thus, Sanchez may only

6

establish Wexford's liability under § 1983 through a *Monell* claim. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

Under *Monell*, a municipality may be liable for money damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a widespread practice of constitutional violations that was "so permanent and well settled as to constitute a custom or usage with the force of law"; or (3) an official with final policy-making authority. *Monell*, 436 U.S. at 690; *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009). The policy or practice "must be the direct cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (citation and internal quotation marks omitted). In other words, "[t]he critical question under *Monell* . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017). Private contractors like Wexford that provide medical services to prisoners are subject to the same liability rules as public entities under § 1983. *Id.* at 378-79; *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021). "Applying this principle, the Seventh Circuit has consistently held that Wexford, which contracts with the Illinois Department of Corrections to provide medical care to inmates at IDOC facilities, can be sued under 42 U.S.C. § 1983." *Willis v. Williams*, 2022 WL 4599260, at *44 (N.D. Ill. Sept. 30, 2022).

The analysis that follows focuses on the first and second theories of *Monell* liability, as Sanchez has not alleged that his injuries were caused by the act of an official with "final policy making authority." *Howell*, 987 F.3d at 653. Putting aside the fact that none of the named individual defendants appear to have ever been employed by Wexford, there are no allegations

7

that Fout, Campbell, or Miles were final decisionmakers. *Banks v. Dart*, 2023 WL 6388063, at *14 (N.D. Ill. Sept. 29, 2023) (dismissing complaint against Wexford where plaintiff failed to allege that any Wexford employee has final policy-making authority).

With respect to the first theory of *Monell* liability, Sanchez identifies two policies allegedly responsible for his delay in care: (1) the policy of placing inmates on a "medical hold" if they have pending appointments scheduled with outside specialists; and (2) the policy of denying coverage for cosmetic or corrective surgery. (Dkt. 75 at 4.) In his Amended Complaint, Sanchez alleges that he was placed on a "medical hold" and could not be transferred to another facility while he had appointments scheduled with outside specialists. (Dkt. 35 ¶¶ 33, 36-37.) Sanchez argues that this policy created "additional institutional delays and administrative barriers" to receiving necessary treatment. (Dkt. 75 at 4.) Additionally, Sanchez alleges that he was told by at least four individuals that Wexford would not pay for surgery to fix his nose, despite his ongoing medical issues. (Dkt. 35 ¶¶ 56, 61-62, 65.) Drawing all reasonable inferences in favor of Sanchez, it is plausible that either policy (or both) was a moving force behind the alleged failure to provide Sanchez with constitutionally adequate medical care. The Court recognizes that Plaintiff's refusal of treatment in February 2023 and May 2023 plays an important role in determinations of liability, as well as the (apparent) fact that no provider recommended surgery for Sanchez. It is also unclear whether Wexford is responsible for the "medical hold" policy. These issues are best addressed on a fully developed record, however, given Sanchez's allegations that various healthcare providers explicitly referred to these policies in the course of his treatment. Sanchez has sufficiently pleaded a plausible right to relief under *Monell* based on an official policy and no more is required at this stage of the proceedings.

8

As to the second theory of *Monell* liability, Wexford argues that Sanchez fails to allege the existence of a widespread custom or policy of deliberate indifference to the medical needs of prisoners. (Dkt. 61 at 5-6). To succeed under this theory, Sanchez must allege "a pattern of 'systemic and gross deficiencies' that is so 'pervasive' as to amount to a de facto policy, rather than a series of isolated incidents." *Wilson v. Wexford Health Sources, Inc.*, 726 F. Supp. 3d 881, 905 (N.D. Ill. 2024) (citing *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020)); *see also Thomas*, 604 F.3d at 303 ("[A] plaintiff must demonstrate that there is a policy at issue rather than a random event."). Sanchez can meet this burden by offering "competent evidence tending to show a general pattern of repeated behavior (i.e., something greater than a mere isolated event)." *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016) (internal quotations omitted). While there is no magic number of injuries that must occur before [a defendant's] failure to act can be considered deliberately indifferent," *Glisson*, 849 F.3d at 382, "it must be more than one instance, or even three." *Thomas*, 604 F.3d at 303.

Additionally, contrary to Wexford's arguments, a plaintiff may rely on incidents relating only to him rather than having to plead examples of other individuals' experiences. *See White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016); *Williams v. City of Chicago*, 2017 WL 3169065, at *8-9 (N.D. Ill. July 26, 2017) ("Post-*White* courts analyzing *Monell* claims . . . have 'scotched motions to dismiss' premised on arguments that the complaint does not contain allegations beyond those relating to the plaintiff.") (collecting cases); *Unroe v. Armor Corr. Health Servs., Inc.*, 2023 WL 4421804, at *3 (N.D. Ill. July 10, 2023). Instead, "[i]n determining whether a plaintiff has sufficiently pled a widespread practice in a *Monell* claim, the Court looks to the instances of misconduct alleged, the circumstances surrounding the alleged constitutional injury,

and additional facts probative of a widespread practice or custom." *Nicholson v. Kramer*, 2021 WL 3367168, at *6 (N.D. Ill. Aug. 2, 2021) (citing *Williams*, 315 F. Supp. at 1079).

Here, Sanchez alleges that Wexford is liable under *Monell* based on three alleged widespread customs and policies: (1) failing to provide adequate medical treatment, including necessary medications, due to understaffing and backlogs; (2) failing to render or arrange emergency care; and (3) delaying or denying outside medical treatment for prisoners. (Dkt. 35 at ¶¶ 2, 27, 29, 42, 75-76); (Dkt. 75 at 8). The Court finds that Sanchez has adequately pleaded a *Monell* claim against Wexford only based on the first alleged widespread practice.

Viewing Sanchez's allegations together, he has pleaded "a series of bad acts that together raise the inference" of a widespread policy, custom, or practice of failing to provide adequate medical treatment due to understaffing. *See Weaver v. Henzie*, 2022 WL 22934948, at *4 (N.D. Ill. May 10, 2022) (citing *Shields v. Ill. Dept, of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014)). Sanchez asserts that, at the Sheridan facility, he initially did not receive additional care for his facial injuries and breathing problems for almost two weeks despite asking for x-rays and follow-up appointments, filing medical requests, and submitting an emergency grievance. (Dkt. 35 ¶¶ 19-30). When asked about the lack of responses, he was told by a staff member the Sheridan HCU was "severely backlogged and understaffed." (*Id*. ¶¶ 25-26). Sanchez only received another evaluation after a correctional officer noticed his deformed nose. (*Id.* ¶¶ 30-31). He immediately filed a request for evaluation of his injuries when he transferred to the Graham facility in July 2023 yet was told that he would not see a provider until "late September" because only one physician served the 1,600-person facility. (*Id.* ¶¶ 41-42). Sanchez did not receive another medical examination until December 2023. (*Id.* ¶ 51). During this period, Sanchez alleges that he requested status updates on his appointment request, had four scheduled appointments cancelled, and filed

10

grievances regarding excessive wait times and the cancelled appointments. Following his first grievance, Sanchez received a response acknowledging that "provider scarcity delayed appointments" and promising that "additional providers would be hired soon." (*Id.* ¶¶ 43-44).

Courts faced with similar allegations have allowed *Monell* claims of medical indifference to proceed beyond the pleading stage. For instance, in *Unroe v. Armor Corr. Health Servs., Inc.*, the Court denied the defendant's motion to dismiss and held that the plaintiff adequately pleaded a widespread policy of delaying care where he suffered from a visible and obvious condition, alleged two protracted delays in scheduling surgery during which he filed multiple unanswered grievances, and claimed that an employee told him a policy of delay existed. 2023 WL 4421804, at *3 (N.D. Ill. July 10, 2023). Similarly, in *Nicholson*, the court reached the same conclusion where the plaintiff alleged he was denied additional treatment for a prolonged period of time despite his grievances and the visibility of his condition and asserted that his denial of care was a result of the sheriff's official policy. 2021 WL 3367168, at *2.

Similarly, here, not only does Sanchez allege multiple protracted periods in which follow-up care was not provided for his obvious injury despite multiple submitted grievances and requests for care, but he also alleges that staff at both Sheridan and Graham told him these delays were, in fact, due to understaffing and backlogs. *See Unroe*, 2023 WL 4421804 at *4 (statement by prison doctor about delays provided "further support" to plaintiff's other allegations of widespread policy of delay medical treatment).

Several other courts have similarly recognized that allegations showing repeated and prolonged delays in care coupled with unanswered or ignored grievances and complaints are enough to plead a widespread practice or policy of failing to provide adequate medical care to prisoners. *See, e.g., Banks*, 2023 WL 6388063, at *13; *Thomas v. Chmell*, 569 F. Supp. 3d 732,

11

739 (N.D. Ill. 2021); *Steele v. Wexford Health Sources, Inc.*, 2018 WL 2388429, at *8 (N.D. Ill. May 25, 2018); *Shaw v. Obaisi*, 2015 WL 638521, at *4 (N.D. Ill. Feb. 12, 2015). Additionally, Sanchez's allegations that multiple medical providers at Graham and Sheridan were aware of his worsening medical condition yet took months to schedule further examinations, order x-rays, or provide him with his prescribed medication create a plausible inference that Wexford's widespread practice of delaying care due to understaffing was the moving force behind Sanchez's continued injuries. *See Banks*, 2023 WL 6388063 at *13; *Chmell*, 569 F.Supp.3d at 739.

The Court reaches different conclusions as to the other two alleged widespread practices—failing to render or arrange emergency care and delaying or denying outside medical treatment for prisoners. Sanchez alleges that Fout did not refer him to an outside emergency facility after treating his injuries at his initial medical examination. (Dkt. 35 at ¶¶ 17-19). He also claims that his January 22, 2023 grievance was deemed a medical emergency, yet he did not receive emergency treatment. (*Id.* ¶¶ 28-29). These allegations, without more, are not sufficient to demonstrate a widespread policy at Wexford of failing to arrange emergency care. *See, e.g., Sanchez v. City of Chicago*, 2024 WL 4346381, at *19 (N.D. Ill. Sept. 30, 2024) (plaintiff failed to establish a widespread practice where she only alleged one incident where medical care was denied to her)*; Tobias v. Dart*, 2013 WL 2597587, at *7 (N.D. Ill. June 11, 2013) (holding that "one or two occasions of not receiving treatment" is not enough to show that there is a widespread practice).

The same reasoning applies to Sanchez's allegations of a widespread custom or policy of delaying or denying outside medical treatment. While at Sheridan, Sanchez received a referral to an outside eye specialist about two weeks after he sustained his injuries. (Dkt. 35 ¶ 33). Dr. Zahtz also offered to refer Sanchez to an outside ENT specialist less than one month later; however, Sanchez declined this referral because he did not want to delay his transfer to Graham. (*Id.* ¶ 37).

12

These facts indicate that Sanchez *was* offered outside treatment shortly after he was injured, but that he declined it. Furthermore, Sanchez was seen by an outside ENT specialist after he was transferred to Graham. (*Id.* ¶¶ 59-60). Accordingly, Sanchez fails to adequately allege that Wexford has a widespread policy of preventing prisoners from obtaining outside medical treatment. *See Johnson v. Frain*, 2018 WL 2087448, at *4 (N.D. Ill. May 4, 2018) (prisoner failed to alleged policy of denying outside medical treatment where facts demonstrated that he was taken to an outside hospital twice); *Harris v. Wexford Health Sources, Inc.*, 2017 WL 4467480, at *3 (N.D. Ill. Oct. 6, 2017) (same where prisoner was taken to an outside hospital one month prior to injury).

To be clear, the Court's assessment of the proper scope of Sanchez's *Monell* claim does not impact Plaintiff's ability to pursue damages for injuries alleged to have resulted from the policies or practices at issue (*i.e.*, the medical hold policy, the policy of denying coverage for cosmetic or corrective surgeries, or persistent staffing shortages at Sheridan and Graham), including damages if these policies and practices resulted in the delay or denial of emergency care or the delay or denial of care by an outside specialist.

As recognized by the Court in *Unroe*, *Monell* complaints are typically dismissed "where plaintiffs have failed to tie the alleged policy to their particular injury or have failed to provide any facts beyond a bare assertion that the policy exists." 2023 WL 4421804 (internal citations omitted); *see also Arita v. Wexford Health Sources, Inc.*, 2016 WL 6432578, at *3 (N.D. Ill. Oct. 31, 2016) (dismissing plaintiff's "factually unsupported, boilerplate allegation" regarding a general policy of ignoring inmates' requests for medical attention). Sanchez has provided more than enough facts to survive a motion to dismiss his *Monell* claim against Wexford[1]. Whether or not he can prove

---

[1] In his Amended Complaint, Sanchez cites to two news articles discussing consent decrees, independent monitoring, and expert reports as evidence of Wexford's practice of denying care to inmates. (Dkt. 35 at ¶ 13). This Court has

his claims is an issue for summary judgment. *See Barwicks v. Dart*, 2016 WL 3418570, at *4 (N.D. Ill. June 22, 2016) (at the motion to dismiss stage, a plaintiff "need only *allege* a pattern or practice, not put forth the full panoply of evidence from which a reasonable factfinder could conclude such a pattern exists"). Wexford's Motion to Dismiss is denied as to Count I.

## II. Medical Malpractice Claim under Illinois State Law (Count III)

In Count III, Sanchez makes a state-law medical malpractice claim against Wexford and Fout, alleging that they had a duty to possess and apply a level of knowledge and care conforming to proper standards of medical practice, breached that duty in his circumstances, and therefore directly and proximately caused the worsening of his injuries. (Dkt. 35 at ¶¶ 89-91).

Wexford argues that this count should be dismissed because Sanchez has not supplied an affidavit of a physician pursuant to 735 ILCS 5/2-622. (Dkt. 61 at 7-8). Under this Illinois statute, in any action for damages "by reason of medical, hospital, or other healing art malpractice," a plaintiff must file an affidavit attached to the complaint declaring one of the following: (1) that the affiant has consulted and reviewed the facts of the case with a qualified health professional who has endorsed the claim as reasonable and meritorious through a written report; (2) that the affiant was unable to obtain a consultation with a medical professional before the expiration of the statute of limitations and shall have 90 days to file the required written report after the filing of the complaint; or (3) the affiant made a request for records which has not been complied with within 60 days of the request, though the written report shall be filed within 90 days of receiving the necessary records. 735 ILCS 5/2-622(a).

---

previously held that plaintiffs cannot rely on documents like these to successfully plead *Monell* claims of deliberate indifference. *Johnson v. Frain*, 2018 WL 2087448, at *5 (N.D. Ill. May 4, 2018). Accordingly, the Court declines to consider these news articles as evidence or support at this stage.

Wexford's argument on this point runs afoul of Supreme Court case law issued after briefing on Wexford's motion to dismiss was already complete. In *Berk v. Choy*, 607 U.S. __, 146 S.Ct. 546 (2026), the Court held that courts must defer to Rule 8 pleading standards and cannot require an affidavit from a medical professional at the pleading stage. *See also Young v. United States,* 942 F.3d 349, 351 (7th Cir. 2019) ("in federal court cannot properly be dismissed because it lacks an affidavit and report under § 5/2-622"). The proper procedure is for a defendant to answer the complaint and subsequently file a motion for summary judgment on the grounds that plaintiff has not supplied the required affidavit and report. *Berk*, 146 S.Ct. at 555 ("the Federal Rules already prescribe a mechanism for putting a plaintiff to his proof: a motion for summary judgment").

Accordingly, Sanchez's medical malpractice claim cannot be dismissed at this stage for failure to include a § 5/2-622 affidavit and report. Wexford may raise these arguments at the summary judgment stage should they still apply. Wexford's Motion to Dismiss is denied as to Count III.

### III. Declaratory/Injunctive Relief Claim (Count IV)

Finally, Wexford moves to dismiss Sanchez's claim for declaratory and injunctive relief in Count IV. (Dkt. 61 at 8-11). Injunctions and declaratory judgments are forms of relief; they are not cognizable as independent causes of action. *See Wittmeyer v. Heartland All. for Human Needs & Rights*, 2024 WL 182211, at *7 (N.D. Ill. Jan. 17, 2024); *Sieving v. Cont'l Cas. Co.*, 535 F. Supp. 3d 762, 774 (N.D. Ill. 2021). Because Sanchez has improperly sought declaratory and injunctive relief as an independent cause of action, Count IV is dismissed.

## **CONCLUSION**

For the reasons stated above, Wexford's Motion to Dismiss [60] is denied as to Counts I and III and granted as to Count IV.

_____
Hon, Virginia M. Kendall
United States District Judge

Date: February 3, 2026